[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff corporation is primarily a grocery wholesaler which also engages in the business of general contracting, engineering and design of grocery store construction and renovation. The defendant corporation is a neighborhood grocery store in the Town Plot section of Waterbury. The parties enjoyed a business relationship for many years during which the plaintiff was the defendant's grocery wholesaler. Around 1993, the defendant decided to renovate and expand its store and engaged the plaintiff to engineer, design and oversee the work. There was no written contract between the parties. There were, however, detailed plans and drawings prepared by the plaintiff and reviewed by the defendant during several meetings between the parties before construction ever began. The defendant obtained the necessary land use permits and approvals without plaintiff's assistance. The parties agree that there was a contract, and, in fact, there was an implied contract.
In effect, the plaintiff acted as the general contractor. In October, 1995, Bozzuto's presented a budget to the defendant totaling $912,124.69. Defendant authorized plaintiff to proceed. Plaintiff hired one Scab as the main trade contractor. Construction began in July, 1995. Plaintiff advised defendant the anticipated completion date would be December, 1995. Defendant continued to operate its business as construction proceeded. Pribula, plaintiff's Director of Engineering, was project manager. He was overseeing three other projects simultaneously, including an expansion of the plaintiff's facility. Pribula left plaintiff's employ in October, 1995, at which time the defendant's project was proceeding slowly. When he left Bozzuto's, Pribula thought the Pilot project would be finished by March or April, 1996. Pribula was unable to devote sufficient time to the Pilot project and did not oversee Scab's performance adequately. The budget for the subject expansion/renovation project included a three percent markup for construction and used equipment and a six percent markup on new equipment which sums would represent Bozzuto's compensation for the work it performed.
After Pribula left plaintiff's employ, nearly a month elapsed before Renihan, newly hired by Bozzuto's, took over for Pribula. It took Renihan CT Page 581 an additional thirty-day period of time to familiarize himself with the project. Although Renihan was dissatisfied with Scab's timeliness of performance, he had limited success in speeding things up. Eventually, Bozzuto's hired, at its own expense, other tradesmen and contractors to complete the work. Although Renihan promised defendant an April 15, 1996 completion date, the defendant was unable to celebrate its "grand reopening" until June, 1996. On or about January 1, 1996, Renihan also promised the defendant that Bozzuto's would forego the markups on equipment and construction.
During the pendency of the construction, other issues arose. Because of building code requirements, an office mezzanine had to be eliminated. The fire marshal also required the installation of a sprinkler system that had not been anticipated at the time the parties reached their agreement. Because of various factors, most impressively costs, it was determined by Bozzuto's to purchase a used HVAC/Refrigeration rooftop unit. At the time Bozzuto's recommended same to defendant, it failed to advise the defendant that the system would not be warranteed. Bozzuto's also failed to determine the weight of the roof-top system to determine whether or not the roof could accommodate the unit. In addition, disputes arose regarding plaintiff's billings to the defendant.
Defendant stopped paying the plaintiff in May or June of 1996. The plaintiff claims that the defendant owes it $334,830.96 on two open accounts. The defendant claims it owes plaintiff nothing; rather, it asserts, the plaintiff owes it monies on its counterclaim for faulty workmanship. Defendant claims monies for lost profits generated by the delay in completion of the project. it claims that Bozzuto's inflated the price of the Scab contract. it claims the plaintiff charged it in excess of the agreed markup and double-billed it. It claims that Bozzuto's agreed not to charge it for the sprinkler system. it claims that Bozzuto's should not have billed it for additional structural steel. The items of workmanship in contention include the roof, the grading of the parking lot, the HVAC/Refrigeration equipment, the tile floors, the floor drains, the painting and the placement of the bollards too close to the building structure.
The defendant also claims that the plaintiff promised it that it would not charge for the sprinkler system, an item costing approximately $56,000.00.
As to the outstanding balance due Bozzuto's, the plaintiff has conceded that the defendant is due a credit of $57,778.14 for the building construction, allowing for materials and labor which defendant paid for directly and a credit for markups to which the plaintiff was not entitled. The plaintiff has also stipulated that the defendant is due an CT Page 582 additional credit of $7,096.40 for miscellaneous items thereby reducing its outstanding claim against the defendant to $245,723.11.
The defendant's contention that it owes plaintiff nothing centers around the various construction estimates that were made during the pendency of the project and the lack of a signed contract between Scab and Bozzuto until Renihan took over the project from Pribula. That contract had a typed-in contract price that was erased or whited out and a hand-written figure was different than the typed-in price. Further complicating matters was the fact that both Pribula and Renihan failed to communicate adequately with the defendant, failed to fully advise it about change orders and the like and failed to explain prices and costs and how they were computed. Because the parties had done business together for about thirty years, there were assumptions of expertise made by each and the relationship was one of trust until the defendant stopped paying.
While the Scab contract price is a matter of concern, the introduction of the written contract for $497,493.00 is persuasive. That price included the sprinkler system. Although the defendant alleges that the plaintiff represented that there would be no charge to the defendant for the sprinklers, the court finds that the plaintiff told Pilot that by eliminating the mezzanine, the cost of the sprinklers would be a wash. However, the court does find that the credible evidence indicates that the contract figure should be deemed to include the costs for structural steel and that the defendant should be credited for an additional $20,210.00 billed by plaintiff for additional steel to support the roof-top HVAC/refrigeration rack. The court finds that the total due Bozzuto's on the contract is $225,513.11.
The court now turns to the defendant's counterclaim for faulty workmanship.
The Bollards: The court finds that the contractor failed to install the bollards twelve inches or more from the wall of the structure and, as a result, the defendant sustained out-of-pocket damages of one thousand dollars. The defendant is hereby awarded a credit of $1,000.00 for the damages caused by the improper replacement of the bollards.
The Roof Rack: The court finds that the defendant failed to prove by a preponderance of the evidence that the system was defective at the time of the installation. Any repairs made were necessitated by ordinary wear and tear and routine maintenance. The defendant is not entitled to a credit.
The Vinyl Floor Tile: The court finds that the vinyl floor was not properly installed and that it has cracked and deteriorated as a result. CT Page 583 One aisle of the defendant's premises has been replaced at a cost to the defendant of $1,722.50. No other replacement has occurred and the defendant has used the existing floor for over six years. It would cost $15,000 to $16,000 to replace the floor. The plaintiff has offered a $5,000 credit. The court finds that the credit offered is fair and reasonable in addition to a reimbursement to the defendant of the monies spent for replacing the vinyl tile in one aisle. The court finds that the defendant is due a credit of $6,722.50 for the vinyl tile.
The Ceramic Floor Tile: The court finds that the ceramic tile was not properly installed. Breaking and chipping of the tiles have occurred in an area constituting twenty percent of the deli-meat section of the store. The life expectancy of a ceramic tile floor is ten years. Fifty percent of the life expectancy of the floor have elapsed. The cost of total replacement would be $27,000.00. The plaintiff has offered defendant a credit of $9,000.00. The court finds that sum to be less than fair and reasonable and awards defendant a credit of $13,000.00.
The Deli Drains: The court finds that the contractor tied in a meat case illegally to a buried grease trap. Defendant's expert testified that the trap should have been removed. That was a significant defect in workmanship that the defendant proved to be Bozzuto's responsibility and for which Pilot should be credited. The defendant spent $10,450.00 to correct the problem, including cutting of the floor, trenching, new piping and a new drain. of the total sums spent by defendant, the court finds that Bozzuto's responsibility for reimbursement is one-half or $5,225.00 and awards Pilot a credit in that amount.
The Parking Lot: The court finds that the defendant failed to prove by a preponderance of the evidence that the installation of the parking lot and ramp were unworkmanlike or not in conformity with code requirements. There was testimony regarding the fact that there was limited room between the store entrance and the street and proper drainage was an important factor as well. The defendant's witness, at best, gave a guestimate of costs and his proposed remedies. No measurements were taken by him nor did he calculate the drainage factors. The defendant is not awarded any credit for this item. While an alley way was to have been paved and was not, the defendant did not introduce any evidence about its cost.
The Roof: The defendant proved by a fair preponderance of the evidence that the roof on the existing building and the new roof on the addition were not tied together properly and that, as a result, leaks developed. The defendant spent $22,000.00 in 1997 to remedy the situation. The premature roof failure resulted from the improper tie-in. The old roof was replaced. The new roof was left on. Additional flashing was installed. CT Page 584 The court finds that the defendant is due a credit of $7,333.00, given the fact that the roof on the existing structure was fifteen years old and had a life expectancy of an additional five years only.
Painting: The court finds that the defendant failed to prove by a fair preponderance of the evidence that anything but ordinary wear and tear caused chipping or fading of paint in the store interior. Pilot is due a credit, however, for the exterior because same was not prepared properly and should have lasted eight years. Defendant is awarded a credit of $1,770.00 being three-quarters of the $2,360.00 estimate
Lost Profits: Simply put, there were too many variables to establish what, if any, amount of claimed lost profits were attributable to the delays in the construction. A very significant factor, other than the building project, was the opening of another super market less than two miles from Pilot's store. The defendant failed to prove by a fair preponderance of the evidence, any amount of loss caused by the delays in construction.
In conclusion, the plaintiff is awarded $225,513.11 on its complaint and the defendant is awarded $35,050.50 on its counterclaim. Costs are not taxed to either party.
By The Court,
SCHEINBLUM, J.